1

2

3

4

5

6                              UNITED STATES DISTRICT COURT
                             WESTERN DISTRICT OF WASHINGTON
7                                        AT SEATTLE

8

9    ED RICHARDS, individually,

10                          Plaintiff,
                                                        C07-1022Z
11   v.
                                                        ORDER
12   THE CITY OF SEATTLE, a municipality,
     and JORGE CARRASCO, an individual,
13
                            Defendants.
14

15          THIS MATTER comes before the Court on defendants City of Seattle's and Jorge

16   Carrasco's respective motions for summary judgment.  Having reviewed all papers filed in

17   support of and in opposition to the motions, and having considered the oral arguments of

18   counsel, the Court does hereby ORDER:

19   (1)    The City of Seattle's motion for summary judgment, docket no. 57, is GRANTED;

20   (2)    Jorge Carrasco's motion for summary judgment, docket no. 56, is GRANTED; and

21   (3)    The Clerk is directed to enter JUDGMENT in favor of the City of Seattle and Jorge

22          Carrasco and to send a copy of this Order to all counsel of record.

23   **Introduction**

24          The Court concludes that trial in this matter would be totally useless.  *See* *Davis v.*

25   *W. One Auto. Group* 140 Wn. App. 449, 461, 166 P.3d 807 (2007) (the "object and function

26   of the summary judgment procedure is to avoid a useless trial").  Nothing would be gained

ORDER  - 1

1   by seating a jury to hear testimony that fails to establish a prima facie case of disparate

2   treatment, retaliation, or hostile work environment.

3        This case is related to the companion case entitled _Davis v. City of Seattle_, Case

4   No. C06-1659Z, in which the Court previously granted summary judgment in favor of

5   defendants City of Seattle and Jorge Carrasco.  As in the companion case, plaintiff's

6   submissions here in opposition to the pending motions for summary judgment are

7   voluminous.  And, as in the companion case, despite their bulk, plaintiff's materials here lack

8   the specificity needed to survive a motion for summary judgment.  Indeed, the filings in this

9   case are more haphazard and lacking in detail than in the companion case.  In this matter,

10  plaintiff's counsel has confusingly filed three declarations of his own, containing a total of

11  1,622 pages of exhibits, which are duplicatively paginated and which plaintiff has often

12  inadequately cited merely by an "A" followed by a page number.  _See_ Sheridan First Decl.

13  (docket nos. 130-133) (containing appendix pages 1-975); Sheridan Second Decl. (docket

14  no. 134) (containing appendix pages 1-536); Sheridan Third Decl. (docket no. 135)

15  (containing appendix pages 1-111).  Meanwhile, plaintiff's own declaration references

16  exhibits that were never attached.  _See_ Richards Decl. (docket no. 143).[1]  Moreover,

17  plaintiff's brief is riddled with unclear or incomplete citations to the record, as well as

18  citations to nonexistent evidence.  _See, e.g._, Plaintiff's Response at 13-14 (docket no. 138-2)

19  (citing "Kefgen at" certain pages, presumably meaning the deposition testimony of

20  Mr. Kefgen, which was not included in plaintiff's original submissions, and which was not

21  made part of the record until over a month after defendants filed their reply briefs in support

22  of their respective motions for summary judgment).

23        Finally, just like in the companion case, plaintiff relies primarily upon inadmissible

24  hearsay, innuendo, and shear speculation.  Plaintiff offers no statistical analysis on which to

25  ───────────

26  [1] In his declaration, plaintiff appears to be describing exhibits that are appended to and identified in
     plaintiff's counsel's first declaration; however, plaintiff's declaration inappropriately attempts to
     provide the foundation for the missing documents.

ORDER  - 2

1  base his claim that he has been treated less favorably than those outside his protected class,

2  and he does not draw the requisite link between his sexual orientation or protected activities

3  and the decisions made by Seattle City Light and Jorge Carrasco.  In sum, notwithstanding

4  the yet again mountainous amount of materials, the majority of which plaintiff does not cite

5  or justify including in the record,[2] plaintiff fails to identify any genuine issue of material fact

6  that would preclude summary judgment or necessitate a trial.[3]

7  **Background**

8  **A.      Plaintiff's Employment History**

9        Plaintiff Ed Richards is a homosexual man who works for Seattle City Light, an

10  electric utility owned by the City of Seattle.  In this lawsuit, he alleges disparate treatment on

11  the basis of sexual orientation, hostile work environment, and retaliation under both state and

12  municipal law.  _See_ Second Amended Complaint (docket no. 192).  He also asserts claims

13  under 42 U.S.C. § 1983.  _Id._  Plaintiff was hired by Seattle City Light in 1998 as a

14  Generation Apprentice.  Richards Decl. at ¶ 3 (docket no. 143).  Plaintiff first worked at the

15  Cedar Falls/Tolt site,[4] but was transferred approximately three months later to the South

16  _____

17  [2] As the Ninth Circuit has explicitly held, counsel bear an obligation to provide in their briefs adequate references to the evidence upon which they rely.  _Carmen v. San Francisco Unified Sch. Dist._, 237

18  F.3d 1026 (9th Cir. 2001).  The Court is not required to independently sift through all of the exhibits attached to the various affidavits or declarations submitted in opposition to a summary judgment

19  motion or to scour the record looking for genuine issues of material fact.  _Id._  If an attorney representing a party resisting summary judgment has not sufficiently cited in the response brief the

20  critical evidence demonstrating a need for trial, the attorney cannot otherwise accomplish the task by merely heaping reams of paper upon the Court.  Nevertheless, the Court independently, unaided by

21  plaintiff's counsel, has climbed the mountain created by plaintiff, has reviewed all of the materials submitted by plaintiff, and has found no admissible evidence that would raise any triable issue of fact.

22  

23  [3] Due to the "sloppy and haphazard format" of plaintiff's response that resulted in "literally days of needless review" by defendants' attorneys, the City of Seattle seeks sanctions.  Reply at 16-17

24  (docket no. 153).  Although plaintiff's poor presentation more than justifies the City of Seattle's request, the Court declines to award sanctions.

25  

26  [4] Plaintiff complains that, while an apprentice at the Cedar Falls/Tolt site, he was subjected to discrimination with respect to reimbursement for mileage and commuting time.  He expresses discontent about needing to involve the union before receiving reimbursement, but he does not make

Substation in Seattle. *Id.* at ¶¶ 3 & 5. At some point during plaintiff's apprenticeship, he worked at the North Substation under the supervision of Mike Wright. *Id.* at ¶ 9. On an unspecified date, Mr. Wright indicated to plaintiff that he believed men and women should have traditional roles and asked whether plaintiff or his partner "was the man." *Id.*

Throughout plaintiff's apprenticeship, for unexplained reasons, his classmates called him "Special Ed." *Id.* at ¶ 8; *see* Richards Dep. at 22:2-12, Exh. F to Wollett Decl. (docket no. 63) (plaintiff never inquired why his classmates nicknamed him "Special Ed," and plaintiff cannot identify any unfair treatment by his classmates that was due to his sexual orientation). During his fourth apprentice year, an instructor inadvertently produced laughter from the students by stating to a visitor during class that he had to get the homework ready because "there is a ferry leaving soon." Richards Decl. at ¶ 10; *see* Richards Dep. at 95:25-97:2, Exh. F to Wollett Decl. Plaintiff speculates that his classmates laughed because they interpreted the comment to mean that he was a "fairy" who was "leaving soon," but plaintiff concedes that the instructor did not have any derogatory intent. Richards Decl. at ¶ 10; Richards Dep. at 96:24-97:1, Exh. F to Wollett Decl. At yet another undetermined date, while working as an apprentice in the Transformer Shop, plaintiff was asked by a journeyman whether he worried about being infected with the human immunodeficiency virus, which causes acquired immune deficiency syndrome ("AIDS"). Richards Decl. at ¶ 11. After plaintiff responded that he had no more reason to worry about infection from his partner than the journeyman did from his wife, the journeyman spoke to plaintiff only when required. *Id.*

In 2002, plaintiff completed the four-year apprenticeship program. *See id.* at ¶¶ 12-13. He worked at the Duwamish Substation while awaiting permanent assignment. *Id.* at ¶ 12. According to plaintiff, apprentices are permitted to pick their assignments in order of their ranking; plaintiff was ranked third in his class. *Id.* Although unclear from his vaguely

---

any claim for unpaid wages or business expenses.

ORDER   - 4

1   worded declaration, plaintiff apparently expressed a desire to work at the Massachusetts

2   Street Substation, but he was asked personally by Paula Rose to accept an assignment at the

3   South Substation.  _Id._ at ¶¶ 12 & 13.  Plaintiff believes that Ms. Rose made the request

4   because the lower ranked apprentices had indicated an unwillingness to work at the South

5   Substation due to the presence there of Heather Talbot.  _Id._ at ¶ 13.  Ms. Talbot was known

6   for displaying "unstable and emotional behavior" toward her fellow crew members, Sheridan

7   First Decl. at 262 (docket no. 130), and plaintiff does not attribute any discriminatory animus

8   to the reluctance of other apprentices to work with Ms. Talbot.  Indeed, plaintiff himself felt

9   "relief" when Ms. Talbot subsequently left the South Substation crew and he no longer had

10  to be "on guard as to what would cause Ms. Talbot's angry episodes."  Richards Decl. at

11  ¶ 15.  In his declaration, plaintiff recites that a lower ranked classmate received the

12  Massachusetts Street Substation assignment, but he does not indicate what consequence

13  might have resulted had he not agreed to the South Substation posting or how such

14  employment action was related to his sexual orientation.[5]

15          In the fall of 2002, plaintiff began working on a crew headed by Wanda Davis.  _See_

16  _id._ at ¶ 14.  In April 2004, plaintiff was scheduled to temporarily assume Ms. Davis's duties

17  as crew chief while she was on vacation.  _Id._ at ¶ 16; _see also_ Sheridan First Decl. at 263

18  (docket no. 130).  In conjunction with Ms. Davis, plaintiff conducted an expectations

19  _____

20  [5] Although plaintiff alleges that the South Substation personnel were collectively known as the "Gay
    Crew," _see_ Richards Decl. at ¶ 13, plaintiff offers no evidence to support his assertion that

21  homosexual employees were "quarantined," _see id._ at ¶ 85, at the South Substation.  Indeed, plaintiff
    offers no evidence that former South Substation crew members Heather Talbot, Rick Marino, and

22  Karl Horne are homosexual, and he provides no specific information, _i.e._, name, job title, sexual
    orientation, assignment dates, etc., regarding other workers on his crew at various points in time.

23  Plaintiff asserts that a recently hired employee, Aaren Thompson, is homosexual and was assigned to
    the South Substation, Richards Decl. at ¶ 45, but he does not indicate how many other homosexual

24  employees were contemporaneously hired or where they were assigned, and he does not state
    whether any heterosexual employees are currently on his crew.  Moreover, plaintiff concedes that,

25  because he was "treated very well" at the South Substation, he never applied to transfer to another
    crew through the bidding process under the applicable collective bargaining agreement.  _See_

26  Richards Dep. at 83:4-19, Sheridan Second Decl. at 484 (docket no. 134).

ORDER  - 5

meeting at the Shoreline Substation with Karl Horne in advance of Mr. Horne's anticipated

rotation to the South Substation.  Richards Decl. at ¶ 16.  Shortly thereafter, Mr. Horne

accused Ms. Davis of discrimination.  *See* Report by Kathleen O'Hanlon, Sheridan First

Decl. at 257-74 (docket no. 130).  After an investigation, Ms. Davis was exonerated as to the

discrimination claim, but was found in violation of workplace expectations.  *See id.*

Ms. Davis was subsequently suspended from work for two days; plaintiff, however, was not

subject to any investigation or any disciplinary action.  *See* Sheridan First Decl. at 834-74

(docket no. 133-6).

While the internal complaint filed by Karl Horne against Wanda Davis was under

investigation, Bill Ivie became the Acting Stations Constructor and Maintenance Supervisor,

a position he held from November 2004 until July 2006, when he retired from Seattle City

Light.  Richards Decl. at ¶ 21; Sheridan First Decl. at 285 (docket no. 130).  Although

plaintiff complains that Mr. Ivie had "a nasty temper," Richards Decl. at ¶ 21, he makes no

contention that Mr. Ivie's poor management style stemmed from animus toward

homosexuals.  Indeed, plaintiff has previously indicated that "Mr. Ivie treated him pretty

well" and that they "got along well, primarily because they had both been in the Navy."

Andrade Decl. at ¶ 8 (docket no. 62).  Moreover, plaintiff has recently withdrawn his claim

that Mr. Ivie discriminated on the basis of sexual orientation in allocating overtime hours.

*See* First Amended Complaint at ¶¶ 2.28, 2.30, and 2.55 (docket no. 148); *compare* Second

Amended Complaint (docket no. 192).  Such allegation ran contrary to the statistical

evidence concerning plaintiff's overtime and out-of-class earnings as compared with his

peers during the years Mr. Ivie held the supervisory position at issue.  *See* Exhs. B & C to

Zimmerman Decl. (docket no. 61).  Thus, although Mr. Ivie apparently did not communicate

well, yelling at and displaying angry behavior toward men and women alike, Sheridan First

Decl. at 291-93 (docket no. 130), plaintiff benefitted financially during Mr. Ivie's tenure,

accruing more overtime and out-of-class earnings than most of his peers.

1    In October 2005, plaintiff filed an internal complaint against a co-worker, Philip Irvin,

2    for sending an e-mail message to fellow employees concerning Seattle City Light's

3    participation in the Gay Pride Parade.[6]  *See* Richards Decl. at ¶ 25; Exh. M to Andrade Decl.

4    (docket no. 62).  A consultant retained to perform an investigation concluded that Mr. Irvin's

5    e-mail was disrespectful, conflicted with workplace expectations, and should have been

6    directed to management rather than co-workers.  Exh. M to Andrade Decl.  Mr. Irvin issued

7    an apology in February 2006, which plaintiff indicated was satisfactory.  *Id.*; Richards Dep.

8    at 114:11-14, Exh. E to Wollett Decl. (docket no. 63).  Plaintiff did not pursue the matter any

9    further.  Richards Dep. at 115:5-11, Exh. E to Wollett Decl.

10    In November 2006, Seattle City Light received an anonymous written complaint

11    alleging that plaintiff and Wanda Davis allowed a non-employee to enter the South

12    Substation and practice for an upcoming apprenticeship working test.  Exh. E to Andrade

13    Decl. (docket no. 62).  An investigation was performed by Colleen Kinerk, an attorney and

14    partner in the firm of Cable, Langenbach, Kinerk & Bauer, LLP.  Andrade Decl. at ¶¶ 10-12

15    & Exh. F.  The decision to use Ms. Kinerk's services was based in part on Ms. Davis's then

16    pending litigation (the companion case) and her assertion therein that Seattle City Light's

17    Employee Relations Manager, Branda Andrade, who otherwise would have conducted the

18

19    [6] In 2007, plaintiff successfully lobbied for a Seattle City Light Bucket Truck to appear in the Gay
Pride Parade.  Richards Decl. at ¶ 34.  Plaintiff drove the truck in the parade.  *Id.*  In connection with

20    planning efforts related to the parade, plaintiff heard from someone in the Seattle Office of Civil
Rights ("SOCR") that Superintendent Carrasco had allegedly stated concerns about employees being

21    naked during the parade and expressed surprise that "[t]hey really celebrate this in Seattle."  *Id.* at
¶ 35.  Plaintiff suggests that such evidence demonstrates an animus toward homosexuals on the part

22    of Superintendent Carrasco.  Plaintiff, however, has not provided a declaration from the SOCR
employee who had this supposed conversation with Superintendent Carrasco, and plaintiff's

23    declaration concerning such double hearsay does not constitute admissible evidence.  *See* Fed. R.
Evid. 805; *see also* Fed. R. Evid. 802.  Thus, the Court will not consider such evidence in deciding

24    the pending motions for summary judgment.  *See* Fed. R. Civ. P. 56(e).  Plaintiff also complains about
Superintendent Carrasco's failure to shake hands with plaintiff's partner at a graduation ceremony,

25    *see* Richards Decl. at ¶ 36, but plaintiff concedes that Superintendent Carrasco did not at that time
know plaintiff is homosexual, *id.*, and he provides nothing more than pure inadmissible speculation

26    concerning the reason why Superintendent Carrasco did not shake hands with his partner.

investigation, was biased.  *Id.* at ¶ 10.  Ms. Kinerk was selected because she is highly regarded and had not previously worked for the City of Seattle or Seattle City Light.  *Id.* at ¶ 11.

In December 2006, Ms. Kinerk submitted a 22-page report, opining that plaintiff and Ms. Davis had violated safety protocols, workplace expectations, and ethics standards.  *See* Letter Report dated December 29, 2006, Exh. G to Andrade Decl. (docket no. 62). Ms. Kinerk summarized the undisputed facts as follows.  Aaron Duvall was Ms. Davis's daughter's boyfriend.  *Id.* at 4.  During the time in question, he was seeking acceptance into Seattle City Light's apprenticeship program.  *Id.*  As part of the application process, he was required to take a "working test."  *Id.* at 11.  The test took place on October 11, 2006, at the Canal Substation.  *Id.* at 6 n.6.  Mr. Duvall did not perform well enough to continue as a candidate for the apprenticeship program.  *Id.*  Sometime prior to the test, however, Ms. Davis assisted Mr. Duvall in gaining access to the South Substation.  *Id.* at 4.  During this visit, Mr. Duvall was suited in a harness and allowed to ascend and descend a steel structure in the South Substation yard.  *Id.*

Ms. Davis alleged that plaintiff was the person who suggested that Mr. Duvall should climb the steel structure.  *Id.* at 5.  When Ms. Kinerk interviewed plaintiff, however, he indicated that Ms. Davis expressly requested him to provide help to Mr. Duvall.[7]  *Id.* at 6. Plaintiff, described by a co-worker as a person who "observes the chain of command," *id.* at 8, then selected a harness for Mr. Duvall, provided safety instructions, and proceeded up the steel structure in front of Mr. Duvall.  *Id.* at 6.  Once on the structure, plaintiff encouraged

---

[7] In his declaration, plaintiff complains that he was provided an inexperienced shop steward during the interview by Ms. Kinerk.  Plaintiff, however, fails to explain how a different shop steward would have affected the answers he gave to Ms. Kinerk's questions.  Plaintiff does not dispute the underlying facts, and he has provided no basis for believing that his choice (or lack of choice) of shop steward would have changed the result of Ms. Kinerk's investigation or was in any way related to his sexual orientation.  Moreover, even if plaintiff's shop steward lacked the requisite experience, his gripe should be directed at his union, not the defendants in this case.

1    Mr. Duvall to simulate the use of binoculars, release his grip, and rely on the harness to hold

2    him.  *Id.*  During this time, Ms. Davis served as the "safety watch person" on the ground.  *Id.*

3    at 7.

4            Based on her investigation, which involved numerous interviews and a review of the

5    relevant contractual and regulatory provisions, as well as internal policies, Ms. Kinerk

6    concluded that permitting a non-employee to enter a restricted and potentially dangerous

7    work site, without prior approval of a supervisor, and then climb a steel structure was a

8    violation of safety protocols concerning which plaintiff and Ms. Davis had, contrary to their

9    denials, received sufficient training.  *Id.* at 15-20.  Moreover, the type and level of assistance

10   provided to Mr. Duvall was of a nature intended to confer an advantage over other

11   candidates taking the apprenticeship working test, and therefore constituted a breach in fact

12   and in appearance of the City of Seattle's ethics standards.  *Id.* at 20-22.

13           In February 2007, plaintiff was advised of proposed disciplinary action, namely a

14   five-day suspension.  Richards Decl. at ¶ 30; Andrade Decl. at ¶ 12 (docket no. 62).

15   Following plaintiff's and Ms. Davis's submission of materials in response to Ms. Kinerk's

16   report,

17   Ms. Kinerk was asked to make additional inquiries and provide a supplemental report.

18   Andrade Decl. at ¶ 12.  Ms. Kinerk subsequently interviewed five current crew chiefs and

19   one former crew chief, as well as six individuals who were involved in security, training, or

20   recruiting for Seattle City Light.  *See* Supplemental Letter Report dated June 18, 2007,

21   Exh. H to Andrade Decl.  Ms. Kinerk made the following findings.  No crew chief believed

22   that he or she had authority to permit a non-employee to access a substation.  *Id.* at ¶ II.B.1.

23   In addition, the consensus among crew chiefs was that they would not have allowed a non-

24   employee to enter a substation to climb a structure.  *Id.* at ¶ II.B.7.  One crew chief opined

25   that, had he done so, "he would have been fired."  *Id.* at 14.

26

1   Based on the reports prepared by Ms. Kinerk, and after considering plaintiff's

2 responsive memoranda and attachments, as well as his statements made during a *Loudermill*

3 hearing at which he was present and accompanied by a union representative, Seattle City

4 Light Superintendent Jorge Carrasco issued a written decision suspending plaintiff for five

5 days without pay.  Letter dated July 24, 2007, Exh. I to Andrade Decl. (docket no. 62).  In

6 his written decision, Superintendent Carrasco noted that plaintiff acknowledged he had

7 "engaged in the underlying activity," but denied that his "actions violated any safety or

8 ethical rules."  *Id.*  Superintendent Carrasco concluded, however, that plaintiff had failed "to

9 establish to [his] satisfaction that [plaintiff's] conduct was justifiable or appropriate."  *Id.*  A

10 few months later, in response to plaintiff's inquiries, Seattle City Light's Director of Energy

11 Delivery Operations, Bernie Ziemianek, explained in a written memorandum that the

12 suspension would be served from October 29 through November 2, 2007, and that plaintiff

13 would be eligible for out-of-class assignments and promotions after March 29, 2008, at the

14 latest; he might, however, have out-of-class and promotional opportunities earlier if he

15 "demonstrate[d] to [Mr. Ziemianek's] satisfaction that [he had] learned from the experience,

16 that the misconduct will not recur, and that [he] will exercise good leadership and judgment

17 skills in the future."  Sheridan First Decl. at 711-712 (docket no. 133-3).

18   Back in February 2007, around the time when plaintiff was advised of the proposed

19 five-day suspension, but before Ms. Kinerk had completed her supplemental investigation,

20 plaintiff had applied for a two-year out-of-class Craft Instructor-Apprenticeship position.

21 Richards Decl. at ¶ 32; Johnson Decl. at ¶ 2 & Exh. A (docket no. 58).  Plaintiff was advised

22 via e-mail that he had not been chosen to interview for the position.  Exh. 16 to Richards

23 Dep., Exh. E to Wollett Decl. (docket no. 63).  In response to plaintiff's inquiry, South Area

24 Field Operations Manager Rich Moralez indicated via e-mail that the reason plaintiff was not

25 interviewed was a determination by Personnel Specialist Susan McClure that plaintiff did not

26 meet the five-year experience requirement.  Exh. 18 to Richards Dep., Exh. E to Wollett

Decl.  Upon further investigation, Ms. McClure's calculation proved incorrect because it failed to take into account the last year of apprenticeship, which could arguably be counted pursuant to a memorandum authored in October 2000 by former Director Pam Smith-Graham.  Johnson Decl. at ¶ 2 & Exh. B.  Ms. McClure, however, made this alleged error with regard to every applicant, thereby deeming three other employees, Dawn Nelson, Jay Jackson, and Rich Togerson, also ineligible for the position.  *Id.* at ¶ 4-7 & Exhs. C-G.  Plaintiff provides no basis for believing that these three employees are homosexual or that sexual orientation played any role in concluding that they and/or plaintiff did not meet the minimum qualifications for the job.

In 2007, plaintiff also sought promotion to crew chief.  West Decl. at ¶ 3 (docket no. 59).  Plaintiff was ranked second among his peers.  *Id.* & Exh. B.  Due to complaints from applicants about the process, Seattle City Light decided to repeat it.  *Id.*  After scores were retallied, plaintiff still ranked second, but the rankings of other candidates changed.  Exh. B to West Decl.  By the time promotional decisions were being made, however, plaintiff was not eligible due to the disciplinary sanctions stemming from his role in Mr. Duvall's accessing of the South Substation and climbing of a structure.  West Decl. at ¶ 3.

**B.      Discipline of Other Employees**

With regard to his claim that discipline has been meted out in a discriminatory or retaliatory fashion, plaintiff has provided no statistical analysis.  Instead, plaintiff offers anecdotal evidence concerning three employees that he contends were sanctioned less

harshly for their respective offenses, namely Karl Horne,[8] Rodney Dunlap,[9] and Ed Kefgen.[10] Plaintiff also submits disciplinary memoranda and/or letters issued to twelve other employees.  *See* Exhs. 3 and 4 to Simpson Decl. (docket no. 126).  The evidence plaintiff has provided does not support his argument that he has been punished more severely due to his sexual orientation or protected activities, but rather shows that his five-day suspension was commensurate with his misconduct and with the discipline imposed on other employees for violations of safety protocols.[11]  As indicated by the documents attached to the declaration of

---

[8] Karl Horne was disciplined for leaving a USB flash drive containing inappropriate material plugged in to a computer at the South Substation and then failing, after an investigation had commenced, to disclose the activity to management.  Sheridan First Decl. at 767-68 (docket no. 132).  Unlike plaintiff's wrongdoing, Mr. Horne's misconduct did not involve any safety violations, and plaintiff makes no showing that Mr. Horne's punishment was not commensurate with his actions or with discipline imposed on other employees for similar misbehavior.

[9] Rodney Dunlap received a reprimand for improperly using a work vehicle for personal business and inappropriately transporting a non-employee therein.  Sheridan First Decl. at 931 (docket no. 133-8).  Mr. Dunlap's transgression bears little or no similarity to plaintiff's actions, which placed a non-employee at potential risk of serious injury.

[10] In 2007, Ed Kefgen was suspended for one day without pay for shoving another employee.  West Decl. at ¶ 3.5 (docket no. 59); Sheridan First Decl. at 895 (docket no. 133-6).  As a result of this disciplinary action, pursuant to an unwritten policy prohibiting promotion and out-of-class assignments for one year following substantial discipline, Mr. Kefgen was deemed ineligible for a promotion.  West Decl. at ¶ 3.5; Ziemianek Decl. at ¶ 5 (docket no. 60).  Such policy had also been applied in 2004 and 2006 when other employees had sought promotions after receiving discipline.  Andrade Dep. at 278:2-280:22, Exh. M to Wollett Decl. (docket no. 63); Hardie Decl. at ¶ 5 (docket no. 157).  Although the City of Seattle concedes that Mr. Kefgen inappropriately received out-of-class assignments after his suspension, it explains that Mr. Kefgen's supervisor acted contrary to management instructions in making such assignments, that the supervisor was chided for doing so and was consequently denied a promotion, and that the supervisor subsequently left Seattle City Light and went to work for another employer.  Heimgartner Decl. at ¶ 7 (docket no. 158).  Thus, plaintiff's allegation that the unwritten policy has been "selectively applied" to him on account of sexual orientation or protected activity lacks any factual basis.

[11] Moreover, this same evidence actually contradicts plaintiff's assertion that, on account of his sexual orientation or protected activity, Seattle City Light has "selectively applied" to him the unwritten policy rendering suspended employees ineligible for promotion and out-of-class assignments for a certain period of time.  According to the documents supplied by plaintiff, in February 2008, a crew chief and a journey level lineworker who were both suspended for safety violations were explicitly advised in letters notifying them of the recommended discipline that, as a result of the suspensions,

Joe Simpson, Business Representative for Local 77, International Brotherhood of Electrical Workers, at least five other Seattle City Light employees were disciplined in 2007 and early 2008 for unsafe conduct, including failure to wear the proper safety gear (five-day suspension), failure to unhook a hoist attached to a reel secured on the rear of a jeep before attempting to drive away, causing the crane's support brackets to break away from the building's wall (five-day suspension recommended, three-day suspension plus remedial training imposed), failure to "rack out" a breaker (three-day suspension), and bringing conductive equipment closer than the minimum approach distance without approved protective barriers (seven-day suspension for crew chief and five-day suspension for journey level lineworker). _See_ Simpson Decl. at 48-53, 60-65, 72-79, 81-94.  With the exception of the last incident, no bodily injuries were involved, and none of these safety violations were combined with ethics or other workplace violations.  As to the employee for whom Superintendent Carrasco agreed to reduce the number of days of suspension, the disciplinary letter indicates that the employee "acknowledged that [he was] at fault and accept[ed] full responsibility for the accident." _Id._ at 64-65.  In contrast, plaintiff continued throughout the disciplinary process to deny that his actions were wrong. _See_ Exh. I to Andrade Decl. (docket no. 62).

they would not be eligible for promotion for one year or for out-of-class opportunities for at least six months. Exh. 4 to Simpson Decl. (docket no. 126).  Thus, the evidence demonstrates uniform application of the unwritten policy.  Plaintiff, however, attempts to rely on these letters to show that the unwritten policy was a "new practice," applied for the first time in his case.  The letters do not support plaintiff's broad proposition; the most they establish is that Seattle City Light has begun including standard language about the unwritten policy in its discipline notifications. _See_ Hardie Decl. at ¶¶ 5 & 6 (docket no. 157) (although the unwritten policy was applied in 2004 and 2006, as well as to Ed Kefgen, on whose behalf the union never raised any challenge, in light of the claim in the companion case that "this practice was additional unfair discipline," Seattle City Light started "writing it into disciplinary letters to avoid any future claims of lack of notice.").  Meanwhile, with regard to plaintiff, Seattle City Light prepared a tailored memorandum communicating to him the effect of his suspension and the steps he could take to regain management's trust.  Sheridan's First Decl. at 711-12 (docket no. 133-3).

1    **Discussion**

2    **A.      Summary Judgment Standard**

3              The Court must grant summary judgment if no genuine issue of material fact exists

4    and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The

5    moving party bears the initial burden of demonstrating the absence of a genuine issue of

6    material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  A fact is material if it

7    might affect the outcome of the suit under the governing law.  *Anderson v. Liberty Lobby,*

8    *Inc.*, 477 U.S. 242, 248 (1986).  In support of its motion for summary judgment, the moving

9    party need not negate the opponent's claim, *Celotex*, 477 U.S. at 323; rather, the moving

10   party will be entitled to judgment if the evidence is not sufficient for a jury to return a verdict

11   in favor of the opponent, *Anderson*, 477 U.S. at 249.

12            When a properly supported motion for summary judgment has been presented, the

13   adverse party "may not rely merely on allegations or denials" in its pleadings.  Fed. R. Civ.

14   P. 56(e).  The non-moving party must set forth "specific facts" demonstrating the existence

15   of a genuine issue for trial.  *Id.*; *Anderson*, 477 U.S. at 256.  A party cannot create a genuine

16   issue of fact by simply contradicting his or her own previous sworn statement, *Cleveland v.*

17   *Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999), or by asserting "some metaphysical

18   doubt" as to the material facts, *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S.

19   574, 586 (1986).  Likewise, discrediting the testimony proffered by the moving party will not

20   usually constitute a sufficient response to a motion for summary judgment.  *Anderson*, 477

21   U.S. at 256-57.

22            To survive a motion for summary judgment, the adverse party must present

23   "affirmative evidence," which "is to be believed" and from which all "justifiable inferences"

24   are to be favorably drawn.  *Id.* at 255, 257.  When the record, however, taken as a whole,

25   "could not lead a rational trier of fact to find for the nonmoving party," summary judgment is

26   warranted.  *See Miller v. Glenn Miller Prods., Inc.*, 454 F.3d 975, 988 (9th Cir. 2006); *see*

1    *also* *Beard v. Banks*, 126 S. Ct. 2572, 2578 (2006)("Rule 56(c) 'mandates the entry of

2    summary judgment, after adequate time for discovery and upon motion, against a party who

3    fails to make a showing sufficient to establish the existence of an element essential to that

4    party's case, and on which that party will bear the burden of proof at trial.'" (quoting

5    *Celotex*, 477 U.S. at 322)).

6    **B.**     **Statute of Limitations**

7              The City of Seattle moves for summary judgment with respect to claims accruing

8    more than three years and sixty days before plaintiff filed this action.  Plaintiff instituted this

9    suit on July 5, 2007.  Complaint (docket no. 1).  The statute of limitations for claims brought

10   under the Washington Law Against Discrimination ("WLAD") is three years.  *Antonius v.*

11   *King County*, 153 Wn.2d 256, 261-62, 103 P.3d 729 (2004); *see* RCW 4.16.080(2) (action

12   for personal injury must be commenced within three years).  The statute of limitations

13   applicable to plaintiff's claims under 42 U.S.C. § 1983 is also three years.  *RK Ventures, Inc.*

14   *v. City of Seattle*, 307 F.3d 1045, 1058 (9th Cir. 2002).  The statute of limitations is tolled

15   during the sixty-day period of mandatory presentment to a local governmental entity.  *See*

16   RCW 4.96.020(4).  Thus, the relevant date for purposes of the statute of limitations analysis

17   in this case is May 6, 2004.  The City of Seattle argues that all causes of action based on

18   discrete acts occurring before this date are time barred.

19             Plaintiff's only response is that the three-year statute of limitations does not apply to

20   hostile work environment claims.  Plaintiff's Response at 23 (docket no. 138-1).  Plaintiff's

21   assertion is a poorly worded summary of the relevant law.  As explained more fully in the

22   Court's order granting summary judgment in favor of defendants in the companion case,[12]

23   although acts contributing to a hostile work environment are treated as one unlawful

24   employment practice for purposes of the statute of limitations, discrete acts, such as

25

26   [12] *See* Order at 27-29 (docket no. 249), *Davis v. City of Seattle,* Case No. C06-1659Z (W.D. Wash.
     Jan. 22, 2008).

1    termination, failure to promote, denial of transfer, or refusal to hire, cannot qualify as related

2    acts, and therefore, are not themselves cognizable unless occurring within the limitations

3    period.  *Antonius v. King County*, 153 Wn.2d 256, 264, 103 P.3d 729 (2004) (citing *Nat'l*

4    *R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 108-13 (2002)).  Here, plaintiff does not

5    deny that any delay or reluctance on the part of Seattle City Light in paying his commuting

6    expenses while he was an apprentice constituted a discrete act, or that plaintiff's assignment

7    to the South Substation at the end of his apprenticeship had the requisite "degree of

8    permanence" to trigger his duty to assert his rights.  Moreover, plaintiff offers no explanation

9    of how the comments or teasing of co-workers during the course of his apprenticeship, about

10   which plaintiff never complained to management, can be imputed to Seattle City Light.  *See*

11   *Washington v. Boeing Co.*, 105 Wn. App. 1, 11, 19 P.3d 1041 (2000) (before an employee's

12   actions are imputed to the employer, a plaintiff must demonstrate that the employer

13   (1) authorized, knew, or should have known of the harassment, and (2) failed to take

14   reasonably prompt and adequate corrective action).  Thus, with respect to events occurring

15   during plaintiff's apprenticeship, as well as all discrete acts prior to May 6, 2004, the Court

16   GRANTS summary judgment in favor of the City of Seattle.

17   **C.    Merits of Plaintiff's Claims**

18          **1.    Disparate Treatment and Retaliation**

19          To defeat the pending motions for summary judgment, plaintiff must, at a minimum,

20   establish a prima facie case of either disparate treatment or retaliation.  *See Hines v. Todd*

21   *Pac. Shipyards Corp.*, 127 Wash. App. 356, 370-71, 112 P.3d 522 (2005) ("Washington

22   courts have adopted the *McDonnell Douglas/Burdine* three-part burden allocation framework

23   for disparate treatment cases." (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792

24   (1973), and *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248 (1981))); *see also Tyner*

25   *v. Dep't of Soc. & Health Servs.*, 137 Wn. App. 545, 564, 154 P.3d 920 (2007) (the

26   *McDonnell Douglas/Burdine* "burden shifting scheme also applies to retaliation claims").

1    To present a prima facie case of disparate treatment, plaintiff must prove that (i) he is

2  a member of a protected class, (ii) he was treated less favorably than a similarly situated non-

3  protected employee, and (iii) the non-protected employee was doing the same work.  *See*

4  *Clarke v. Office of the Attorney Gen.*, 133 Wn. App. 767, 788-89, 138 P.3d 144 (2006).  To

5  make out a prima facie case of retaliation, plaintiff must establish that (i) he engaged in

6  statutorily protected activity, (ii) Seattle City Light and/or Jorge Carrasco took some adverse

7  employment action against him, and (iii) a causal link exists between the protected activity

8  and the adverse action.  *See Tyner*, 137 Wn. App. at 563.

9    Only if plaintiff presents sufficient evidence of a prima facie case does the burden

10  shift to Seattle City Light and Superintendent Carrasco to provide evidence of legitimate,

11  nondiscriminatory reasons for their actions.[13]  *See id.* at 563-64; *see also Hines*, 127 Wn.

12  App. at 371.  The final burden rests on plaintiff to produce evidence that the asserted reasons

13  are merely a pretext.  *See Hines*, 127 Wn. App. at 371.  To establish pretext, plaintiff must

14  put forward specific evidence indicating that the articulated nondiscriminatory reasons are

15  "unworthy of belief."  *See id.* at 372.  "Speculation and belief are insufficient to create a fact

16  issue as to pretext.  Nor can pretext be established by merely conclusory statements of a

17  plaintiff who feels that he has been discriminated against."  *Id.* (quoting *McKey v. Occidental*

18  *Chem. Corp.*, 956 F. Supp. 1313, 1319 (S.D. Tex. 1997)).  Moreover, summary judgment

19  may be granted in favor of an employer even when the employee has created a weak issue of

20  fact concerning pretext, if abundant, uncontroverted, independent evidence indicates that no

21  discrimination or retaliation occurred.  *See Tyner*, 137 Wn. App. at 564 (quoting *Milligan v.*

22

23  [13] Jorge Carrasco has cited two Washington cases in support of his assertion that his burden is
limited to showing that his decision to suspend plaintiff was based on substantial evidence that he

24  reasonably believed was true.  Reply at 5 (docket no. 152).  The cited cases, however, did not
involve claims of discrimination or retaliation, and they addressed only whether the respective

25  terminations for "just cause" or a specified infraction constituted breaches of the employment
contracts.  *See Gagliardi v. Denny's Restaurants, Inc.*, 117 Wn.2d 426, 815 P.2d 1362 (1991);

26  *Baldwin v. Sisters of Providence in Wash., Inc.*, 112 Wn.2d 127, 769 P.2d 298 (1989).  Thus, the
Court has not applied the standard proposed by Mr. Carrasco.

ORDER   - 17

1   *Thompson*, 110 Wn. App. 628, 637, 42 P.3d 418 (2002) (quoting *Reeves v. Sanderson*

2   *Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000))).

3          In this case, plaintiff fails to present even a prima facie case of disparate treatment or

4   retaliation.  Although plaintiff discusses Karl Horne and Bill Ivie at great length, he does not

5   describe any adverse employment action stemming from his dealings with either man.

6   Plaintiff was not disciplined in connection with Ms. Davis's inappropriate treatment of

7   Mr. Horne, and plaintiff does not identify any ill treatment, financial or otherwise, that he

8   received from Mr. Ivie.[14]  Plaintiff's assertion that co-worker Phil Irvin's apology was not

9   genuine does not present an actionable claim; plaintiff admits that he accepted the apology

10  relating to Mr. Irvin's e-mail concerning the Gay Pride Parade, and that he did not further

11  pursue the matter.  Even if Mr. Irvin continued to harbor anti-homosexual sentiments,

12  plaintiff has no basis for imputing them to Seattle City Light; the undisputed evidence

13  indicates that Seattle City Light promptly investigated plaintiff's complaint, confronted

14  Mr. Irvin about his behavior, and resolved the problem to plaintiff's expressed satisfaction.

15  *See Washington*, 105 Wn. App. at 11.

16         As to the alleged miscalculation of plaintiff's seniority date, which led to him being

17  deemed ineligible for the Craft Instructor-Apprenticeship position, plaintiff has not

18  established that he was treated any differently or less favorably than similarly situated non-

19  protected employees.  Plaintiff does not challenge or contradict the City of Seattle's evidence

20  that the same calculation method was applied to all candidates and that three other

21

22  [14] Plaintiff instead tries to compare himself to Mr. Ivie, offering the declaration of co-worker Carol Girdis, who has recounted a previous instance in which Mr. Ivie brought a non-employee into the

23  South Substation.  *See* Girdis Decl. at 1-3 (docket no. 114).  Plaintiff's reliance on such evidence is misplaced.  Ms. Girdis makes no contention that Mr. Ivie allowed the non-employee to climb a

24  structure in the substation yard or assisted the non-employee in doing so.  Moreover, even if Mr. Ivie's actions violated Seattle City Light policies, the fact that he was not caught or punished

25  does not vindicate plaintiff's behavior.  Finally, to the extent Ms. Girdis's testimony is being offered as evidence of Mr. Ivie's harassing conduct, Ms. Girdis herself admits that she "did not report his

26  behavior to anyone," *id.* at 4, and therefore, any mistreatment of Ms. Girdis by Mr. Ivie cannot be imputed to Seattle City Light.  *See Washington*, 105 Wn. App. at 11.

employees, who have not been identified by plaintiff as homosexual, were also disqualified and not interviewed for the position. Finally, with regard to his five-day suspension, plaintiff has not demonstrated that he was punished more severely than heterosexual or non-litigating employees engaging in comparable violations of safety protocols. Plaintiff's contention that the proximity between the date he filed this lawsuit and the date he was advised of Superintendent Carrasco's final decision demonstrates the requisite retaliatory causal link lacks merit. Ms. Kinerk's initial report was issued in December 2006, and plaintiff was advised of proposed disciplinary action in February 2007, months before he initiated this action. Ms. Kinerk's supplemental report, from which plaintiff could infer that the recommended sanction was likely to be imposed, was available in June 2007, a couple of weeks before plaintiff filed suit. Although Superintendent Carrasco's written decision post-dates plaintiff's complaint by nineteen days, the sequence of events in this case does not create a presumption of retaliatory motive.[15] *See* *Wilmot v. Kaiser Alum. & Chem. Corp.*, 118 Wn.2d 46, 69, 821 P.2d 18 (1991) ("[p]roximity in time between the claim and the firing is a typical beginning point, *coupled with evidence of satisfactory work performance and supervisory evaluations*" (emphasis added)). To adopt plaintiff's simplistic approach would encourage every employee with advance warning of disciplinary action to file suit before the sanction is imposed so as to preserve the ability to claim retaliation. The Court declines to do so.

---

[15] Likewise, Paula Rose's alleged statement that plaintiff is "collateral damage" for Ms. Davis's lawsuit, Richards Decl. at ¶ 46, does not prove the requisite causal link. As an initial matter, plaintiff does not provide a declaration from Ms. Rose, and he fails to establish that Ms. Rose's statement to him is admissible hearsay. Statements concerning the reasons for an adverse employment action are admissible under Rule 801(d)(2)(D) only if the declarant was involved in the decision. *See* *Taylor v. Battelle Columbus Labs.*, 680 F. Supp. 1165, 1171 (S.D. Ohio 1988) (citing *Hill v. Spiegel, Inc.*, 708 F.2d 233 (6th Cir. 1983)); *see also* *Young v. James Green Mgmt., Inc.*, 327 F.3d 616, 622 n.2 (7th Cir. 2003) (quoting *Aliotta v. Nat'l R.R. Passenger Corp.*, 315 F.3d 756 (7th Cir. 2003)). Plaintiff has offered no evidence that Ms. Rose participated in the decision to suspend him or that Ms. Rose had the authority to discuss or express views about the disciplinary process. Moreover, even if admissible, Ms. Rose's statement does no more than express a personal opinion having nothing to do with any protected activities on plaintiff's part.

1      Even if, however, plaintiff is presumed to have presented a prima facie case of

2  discrimination or retaliation, the adverse decision here rests on legitimate grounds, and

3  plaintiff must present some evidence that the articulated basis for his suspension is

4  "unworthy of belief."  _See_ _Hines_, 127 Wn. App. at 372.  Plaintiff has not done so.  Instead,

5  plaintiff asserts that the City of Seattle and Superintendent Carrasco have failed to articulate

6  a legitimate reason for plaintiff's suspension, citing _Davis v. Team Elec. Co._, 520 F.3d 1080

7  (9th Cir. 2008).  _Team Elec._, however, is entirely distinguishable.  In _Team Elec._, shortly

8  after the plaintiff filed an employment discrimination claim, she was laid off.  _Id._ at 1094.

9  Although the employer laid off sixteen other workers for economic reasons, the employer

10  could not articulate why it chose to lay off the plaintiff in particular.  _Id._ ("as the company

11  conceded at oral argument, there is no evidence in the record as to why Davis in particular

12  was laid off").  On the other hand, the evidence indicated that the plaintiff was senior to

13  electricians that were retained by the employer and that she was considered by her

14  supervisors to be a skilled and dedicated worker.  _Id._  Thus, the Ninth Circuit concluded that

15  the plaintiff had presented sufficient evidence to raise a genuine issue of material fact

16  concerning whether the employer had a retaliatory motive for laying her off.  _Id._ at 1095.  In

17  contrast, the adverse employment action here involves only plaintiff and Wanda Davis.  The

18  five-day suspension was based on specific reasons outlined in two written reports by an

19  external investigator, a memorandum advising plaintiff of the proposed disciplinary action,

20  and a letter by the final decision-maker, all of which are part of the record in this case.  In

21  sum, this case simply bears no resemblance to _Team Elec._

22      Although plaintiff continues to discount the conclusions drawn by Ms. Kinerk and

23  adopted by Superintendent Carrasco,[16] he does nothing to undermine the City of Seattle's

24  _____

25  [16] In disputing Ms. Kinerk's report, plaintiff has inappropriately extrapolated from deposition

26  testimony provided by Christopher Heimgartner, the Customer Service and Energy Delivery Officer for Seattle City Light.  During his deposition, Mr. Heimgartner indicated that no policy violation would have occurred if plaintiff and Wanda Davis had obtained permission in advance of assisting

1  explanation for the suspension.[17]  The Court's function in a case of this nature is not to

2  second-guess the employer's interpretation of its policies and regulations, but rather to assess

3  whether sufficient evidence of discriminatory or retaliatory behavior has been presented to

4  warrant a trial.  Here, plaintiff does not make the requisite showing; he does not dispute the

5  wrongdoing that led to his suspension, and he offers no evidence that similar misconduct by

6  non-protected employees has been less harshly punished.  The Court therefore GRANTS

7  summary judgment in favor of the City of Seattle and Jorge Carrasco as to plaintiff's

8  disparate treatment and retaliation claims.

9

10  Aaron Duvall to climb the structure at the South Substation.  See Heimgartner Dep. at 53:16-54:2,
   Sheridan Second Decl. at 96-97 (docket no. 134).  Citing this testimony, plaintiff asserted at oral

11  argument that "safety is a red herring" because Mr. Duvall's climb could have been authorized.
   Plaintiff's contention misses the mark.  Plaintiff offers no evidence that, had he and Ms. Davis asked,

12  they would have received permission for the climb.  In addition, regardless of whether the climb was
   inherently safe or unsafe, Seattle City Light had legitimate liability concerns justifying its insistence on

13  management approval as a condition precedent to this type of behavior.  Plaintiff's other attacks on
   Ms. Kinerk's report are equally misguided, particularly his implied argument that a safety policy must

14  anticipate and articulate every possible way in which an employee could be injured or injure someone
   else, which is an onerous standard unsupported by any authority.  Plaintiff's submission of

15  declarations from other Seattle City Light employees, whose positions or relationships to this case are
   not fully explained, is likewise of no avail.  For example, Phil Boulton describes various non-

16  employees, including fire and police personnel, who have been allowed into a substation, but he does
   not identify anyone else who has climbed a structure in the yard.  See Boulton Decl. at 3 (docket

17  no. 113).  Kari Lundquist discusses job shadowing by current employees, but does not address
   whether such opportunities are available to candidates or other non-employees or the climbing of any

18  structures by anyone.  See Lundquist Decl. at 3 (docket no. 118).  Finally, Alice Lockridge states that
   "teaching is not cheating" and indicates that "it is not cheating to tell the test taker[s] what will be

19  expected of them and letting them try the test or practice for it before the actual test happens,"
   Lockridge Decl. at 4 (docket no. 116), but she does not speak to the use of Seattle City Light

20  facilities for test preparation or to the practice of providing opportunities to one candidate that were
   not made available to any other applicant.  Finally, plaintiff offers no basis for concluding that

21  Ms. Lockridge speaks for Seattle City Light or that her opinions are other than merely her own.

22

23  [17] Plaintiff's contention that resort to an external investigator, namely Colleen Kinerk, itself
   constitutes evidence of discriminatory animus lacks any merit.  Plaintiff's underlying assumption that,

24  had Seattle City Light handled the matter internally at the supervisor level, as he suggests is
   customary, he would have received less severe or perhaps no disciplinary sanctions is based on

25  nothing more than wishful thinking.  Moreover, to the extent an internal review had produced similar
   results, for example, an equivalent, slightly shorter, or perhaps longer suspension, the City of Seattle

26  would have been subject to attack for not involving an external investigator.  This type of "no-win"
   challenge proves nothing of any relevance to the disposition of this case.

1

**2.**    <u>**Hostile Work Environment**</u>

2    Plaintiff attempts to transmute his various disparate treatment claims into one hostile

3 work environment claim.  Plaintiff may not do so.  Discrete acts, such as refusal to promote,

4 denial of transfer, suspension, and demotion, are independently actionable, and they may not

5 be cobbled together into a harassment claim.  <u>See</u> <u>Antonius</u>, 153 Wn.2d at 264; <u>see also</u>

6 <u>Morgan</u>, 536 U.S. at 113 ("discrete discriminatory acts are not actionable if time barred,

7 even when they are related to acts alleged in timely filed charges").   Indeed, were the Court

8 to accept plaintiff's view, then the hostile work environment rubric would serve no purpose;

9 it stands in contrast to discrete acts of discrimination or retaliation, and it operates in

10 circumstances when an independent act is not sufficient to cause distress, but a series of

11 similar or related acts is intolerable.  To prove a claim of hostile work environment, plaintiff

12 must establish that the harassment at issue (i) was unwelcome, (ii) was due to his

13 membership in a protected class, (iii) affected the terms and conditions of his employment,

14 and (iv) was imputable to his employer.  <u>Clarke</u>, 133 Wn. App. at 785.  To satisfy the third

15 element, the harassment must be "sufficiently pervasive so as to alter [his] employment

16 conditions" and the conduct must be more than merely offensive.  <u>Id.</u>  "The conduct must be

17 both objectively abusive (reasonable person test) and subjectively perceived as abusive by

18 the victim."  <u>Adams v. Able Bldg. Supply, Inc.</u>, 114 Wn. App. 291, 297, 57 P.3d 280 (2002)

19 (citing <u>Harris v. Forklift Sys.</u>, 510 U.S. 17, 21-22 (1993)).

20    Plaintiff does not allege any actionable harassing conduct by Bill Ivie or any other

21 supervisor.  Moreover, he offers no evidence that any harassing activities by co-workers or

22 the like could be imputed to Seattle City Light or Superintendent Carrasco; he describes no

23 incident in which he complained about harassment and his employer failed to take

24 reasonably prompt and adequate corrective action.  <u>See</u> <u>Washington v. Boeing Co.</u>, 105 Wn.

25 App. 1, 11, 19 P.3d 1041 (2000); <u>see also</u> <u>Sangster v. Albertson's, Inc.</u>, 99 Wn. App. 156,

26 164-65, 991 P.2d 674 (2000) (observing that, when a supervisor is alleged to have created a

hostile work environment, an employer may raise an affirmative defense requiring proof that the employer exercised reasonable care to prevent and promptly correct harassing behavior and the plaintiff unreasonably failed to take advantage of such preventive or corrective opportunities (citing *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742 (1998), and *Faragher v. City of Boca Raton*, 524 U.S. 775 (1998))).  Finally, the behavior about which plaintiff complains fails to satisfy either the sufficiently pervasive or the objectively abusive standard, and therefore, does not as a matter of law support a claim for hostile work environment. Thus, the Court GRANTS summary judgment in favor of the City of Seattle and Jorge Carrasco with respect to plaintiff's hostile work environment claim.

### 3.   Section 1983 Claims

In this context, to establish a violation of 42 U.S.C. § 1983, plaintiff must prove that Seattle City Light and/or Jorge Carrasco acted with the intent to discriminate.  *See Sischo-Nownejad v. Merced Cmty. Coll. Dist.*, 934 F.2d 1104, 1112 (9th Cir. 1991); *see also Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 583 n.16 (1984) (relief is authorized under Section 1983 only when intentional discrimination has been proven or admitted).  Having failed to demonstrate disparate treatment or retaliation under the WLAD,[18] plaintiff likewise has not met the purposeful discrimination requirement for a Section 1983 claim based on equal protection.  *See Sischo-Nownejad*, 934 F.2d at 1112 (citing *Knight v. Nassau County Civil Serv. Comm'n*, 649 F.2d 157, 161-62 (2d Cir. 1981)). The Court therefore GRANTS summary judgment in favor of the City of Seattle and Jorge Carrasco with regard to plaintiff's claims under Section 1983.

---

[18] Plaintiff asserts that Jorge Carrasco is individually liable pursuant to both the WLAD's aiding and abetting provision, RCW 49.60.220, and Section 1983.  Plaintiff also raises claims under the Seattle Municipal Code.  In light of the Court's rulings on the causes of action brought under the WLAD, the Court also GRANTS summary judgment against plaintiff on the individual claims against Jorge Carrasco and the claims based on municipal law.

1  **Conclusion**

2       For the foregoing reasons, the Court GRANTS both pending motions for summary

3  judgment.  Judgment shall be entered forthwith in favor of the City of Seattle and Jorge

4  Carrasco.

5       IT IS SO ORDERED.

6       DATED this 26th day of June, 2008.

7

8                                     _____
                                      Thomas S. Zilly

9                                      United States District Judge

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

ORDER  - 24